## EX PARTE REYNOLDS.

1. PARENT AND CHILD—ESTOPPEL.—The right of the parent to the custody of the child cannot be defeated by a mere parol gift of the parent to another, but if a parent undertake to make a parol contract absolutely bestowing the custody of his child upon another and permit the child to acquire a new home and strong attachments and tender asociations to spring up, he is estopped from asserting his right to the custody of the child, and the party asserting such estoppel must show it by evidence clear and convincing. Evidence here held not to show a clear and definite parol agreement for unconditional surrender of child by parent to another.

2. IBID.—To establish that a father's moral character and financial condition make him unfit to assume the custody of his child, it is neces-

sary to show clearly that provision for the ordinary comfort and contentment and the intellectual and moral development of the child are not to be expected at his hands. *Held,* that the evidence here shows that the father had at one time brought reproach upon himself and children by intemperate habits and by permitting others to largely provide for them, but that he has reformed and he is now a fit person in character and financial condition to have the custody and rearing of his children.

3. Ibid.—The wishes of a child of tender years as to its custody against its parent may be learned by the Court, not that it has a legal right to decide for itself, but that the Court may be better prepared to exercise its discretion wisely as to the disposition of the child.

Petition in the original jurisdiction of this Court by James B. Reynolds for writ of habeas corpus to obtain possession of his children.

*Messrs. Sheppards, Grier & Park,* for petitioners.

*Messrs. B. T. Rice* and *Bellinger & Welch,* contra.

February 26, 1906. The opinion of the Court was delivered by

Mr. Justice Woods. The solemn and painful duty is imposed on the Court of determining, in this application for the writ of habeas corpus, the right to the custody of the children, William Osborne Reynolds, Mary Susan Reynolds and Nannie Reynolds. Mrs. Mary Susan Reynolds, the mother of the children, died in August, 1899. The contest is between James B. Reynolds, petitioner, the father of the children, now residing in Greenwood, and Miss Lucy S. Peyton, their cousin, and Mrs. Mell Bellinger, their step-grandmother, with whom they live together in Barnwell, Miss Peyton claiming William and Nannie, and Mrs. Bellinger claiming Mary.

These claims against the father rest upon the allegations, (1) that he promised his wife on her death bed that Miss Peyton should have the rearing of the children, and in pursuance of this promise has allowed her to keep and support

them since their mother's death, and that he is now estopped from taking them back after Miss Peyton has used her means in their support and such strong affection has grown up between her and the children that a separation would be deeply distressing; and (2) that the petitioner drinks to excess, is thriftless, immoral, and without means to maintain and educate his children, and should not be allowed to take them from a home of comfort and refinement where they will be supported and sent to school, and where they wish to remain.

It is important to set out the facts of the family history which gave rise to this deplorable controversy, and reconcile as far as possible the affidavits of witnesses of high character which bear materially on the issues.

James B. Reynolds and Mary Susan Bellinger were married February 23, 1892, and thereafter Miss Peyton lived with them on land in Barnwell County in which she had at that time or subsequently acquired at least a life interest. It does not satisfactorily appear to what extent Miss Peyton and Reynolds respectively contributed to the support of the family, but it seems the family lived in agreement and without controversy about matters of property until some time after the death of Mrs. Reynolds, when Miss Peyton moved to Barnwell, taking with her the children, where they remained in Miss Peyton's home with the consent of Reynolds until a short time before this proceeding was instituted. Was this in pursuance of a promise given by Reynolds to Miss Peyton at the instance of his dying wife that she should have permanent custody and control of the children, as Miss Peyton contends, or was it merely a temporary arrangement intended to last until Reynolds could supply a suitable home for them? Mrs. Bellinger gives this statement of the promise: "Deponent was present at the death of said Mary Susan Reynolds, and at her request called her said husband, James B. Reynolds, to her bedside, and in the presence of this deponent stated to her said husband that she wished to commit her children to the care and training of Miss Lucy

Peyton, and asked him if he would consent and promise that Miss Lucy Peyton should have the raising of her children, and the said James B. Reynolds then and there stated to his dying wife, 'I promise you that she (Miss Peyton) shall have the children.' " Miss Peyton's version is: "That Mary Susan Reynolds, the mother of said children, died at the house and home of the respondent about five years ago; that just a few hours previous to her death, she called the respondent and her said husband, James B. Reynolds, to her bedside and there asked respondent to take her children and raise them, and then asked her said husband to consent and promise that he would see that the children were committed to the care and raising of this respondent; that this respondent then and there agreed to accept the care and raising of the said children, and said James B. Reynolds at the same time promised his dying wife that this respondent should have the rearing of said children, and that he would aid in maintaining and supporting them." Dr. Cannon says that the promise was that "the children should be committed to the care of Miss Lucy Peyton, and that she should have the rearing and raising of them, and the said James B. Reynolds then and there agreed to the same, and promised his dying wife that Miss Lucy Peyton should have the raising of their children, and Miss Peyton agreed to raise said children."

When it is remembered that Miss Peyton, then an elderly maiden lady, and the husband were at the time the promise was made to the dying wife of the same household, living in accord, and that it is not denied that the husband and wife had lived in affection and trust, it would not only be straining the meaning of the words used, but overlooking the environment of the parties and their relations to each other, as well as the motives and purposes to be found in the outflow of natural affection, to suppose that Mrs. Reynolds exacted and her husband promised an absolute surrender of his children. It would not be just to the dying wife and mother to attribute to her a desire, much less the exaction of a promise, that her husband should no longer have a father's care and

responsibility for their children. The plain purpose and wish which prompted the request was that Miss Peyton should remain in the father's family and rear and care for the children—there is not a word to indicate that he was to cease to be the head of the family. A promise made under such compelling conditions should not be held to extend to and impose an obligation, legal or moral, which he who promised did not plainly and distinctly contemplate and assume. The utmost that can be said to have been in contemplation in this instance was that Miss Peyton should have the place and duties of a mother, not the rights and obligations of a father. It is true, that the affidavit of Mr. H. L. O'Bannon is to the effect that petitioner, long afterwards, told him "that while his wife lay upon her dying bed she made a request of him that their children be given to Miss Lucy Peyton after her death, and to this he consented and promised then, but that he did not intend to abide by that contract now, because at the time it was made he was almost crazed with grief." Mr. O'Bannon does not undertake to give the exact words of the interview, and the petitioner insists that an admission that he had *given* his children to Miss Peyton was far from his meaning. The impression of Mr. O'Bannon, however, might well have been received from even an exact account of the last interview between the husband and wife by one not familiar with all the circumstances. However that may be, the accounts of the last interview given by Mrs. Peyton, Mrs. Bellinger and Dr. Cannon, all eye-witnesses, warrant the conclusion that the petitioner did not give or promise to give his children to Miss Peyton in the sense of relinquishing to her his rights and duties as a father.

After the death of Mrs. Reynolds, in August, 1899, Miss Peyton, Reynolds, and the children continued to live together as one family until January, 1903, and there is no evidence or intimation that during all this period the petitioner did not claim and exercise the rights of a father. There is, it is true, a variance between Miss Peyton and petitioner as to the support of the family, her statement being that it came

mainly from her means, while the petitioner swears she not only did not contribute to the support of the family, but on the contrary he contributed largely to her support. It is impossible from the affidavits to reach any satisfactory conclusion on this issue, but assuming that Miss Peyton did contribute generously to the support of the family, this would not imply the surrender of parental authority, especially when all were living as one household.

About January, 1903, Miss Peyton rented the farm on which the family was living and moved to the town of Barnwell, taking with her the children, William Osborne and Nannie. She says this change was made necessary by the drinking habits of the petitioner, and that she now supports and sends to school the two children above named, who are living with her. Mrs. Bellinger has had the care of Mary Susan for five years, but she does not set up any promise of the father to her concerning the custody of this child. The petitioner gives this account of Miss Peyton's removal to Barnwell, and the present custody of his children by Miss Peyton and Mrs. Bellinger: "That in the year 1903, Miss Lucy S. Peyton decided to move to the town of Barnwell to the home of Mrs. Mell Bellinger, the widow and second wife of Dr. Martin Bellinger, and requested of this deponent that the said children be permitted to go with her and stay with her until such time as deponent could settle up his business affairs in that county and prepare and arrange for his children a home in Greenwood, where he had decided to remove, to which proposal deponent consented; that deponent stated at the time that he would not give his children to any one and would not give them to Miss Peyton or to Mrs. Bellinger, but would consent for them to remain away from him only for such length of time as was necessary for him to provide a suitable home for them, and he has never renounced his right as a father to their custody or control over or to them or either of them; that Mrs. Bellinger on more than one occasion tried to persuade deponent to give her his daughter Sue, which he has always refused to do." Though

this important statement of the circumstances and conditions under which Miss Peyton was allowed to take the children was made in the affidavit attached to the original petition, it is significant that it is not denied in any of the affidavits submitted on behalf of Miss Peyton and Mrs. Bellinger. The undisputed fact that the petitioner took one of the children, Eleanor Taft, to his home in Greenwood and is still keeping her there without objection on the part of Miss Peyton, and the further fact that Mrs. Bellinger has in her exclusive care another child, Mary Susan, goes very far to support the petitioner's statement that they were never given to Miss Peyton unconditionally and that she did not so receive them.

The weight of authority sustains the doctrine that the right of a parent to the custody of a child cannot be defeated by a mere parol gift of the child by the parent to another. *Fletcher* v. *Hickman*, 88 Am. St. Rep., 869, note; 21 A. & E. Ency. Law, 1039; *Washaw* v. *Gimble*, 7 S. W., 389 (Ark.); *Foulke* v. *People*, 36 Pac., 640 (Col.); *Brooke* v. *Logan*, 2 Am. St. Rep., 177; *Hussey* v. *Whiting*, 57 Am. St. Rep. (Col.), 220; *Weir* v. *Marley*, 6 L. R. A., 672; *Hibbette* v. *Bains*, 51 L. R. A., 839; *State* v. *Libbey*, 82 Am. Dec., 223. The reason upon which this doctrine rests—that such a parol gift is against public policy—is strengthened in this State by the statute which sanctions the disposition by a parent of the custody and tuition of a child, but provides that such disposition shall be evidenced "by his or her deed executed and recorded according to law." Code 1902, sec. 2689. Nevertheless, if a parent undertakes to make a parol contract absolutely bestowing the custody of the child upon another, and allows the child to acquire a new home, and strong attachments and tender associations to spring up, the Court will not, at his instance, ruthlessly break these ties which have come into existence through his acquiescence and neglect to assert his right. In such case the parent is estopped, and the affection of those who have cared for the child and learned to love it will not be sacrificed

unless the interests of the child require that it should be restored to the parent. *Enders* v. *Enders,* 27 L. R. A., 60, note; *State* v. *Libbey,* 82 Am. Dec., 223 (N. H.). By such a surrender, however, the parent does not escape the duty he owes the child and the State to provide for its support and education, if he to whom it is entrusted fails to do so. *Anderson* v. *Young,* 54 S. C., 393. Those who receive children from parents without the deed provided by statute, relying upon estoppel of the parents, are charged with notice that the presumption is very strong that a right so precious as that of a parent to a child will not be unconditionally given away except for very cogent reasons, especially when such gift does not free from parental obligation, and it devolves upon them to prove a certain and definite agreement and estoppel by conduct by evidence clear and convincing. *Brooke* v. *Logan,* 2 Am. St. Rep., 184, note. As we have seen, the evidence in this case falls far short of leading to the conviction that there was a clear and definite parol agreement for unconditional surrender of the children by the parent, or that he ever acquiesced in their permanent residence with Miss Peyton and Mrs. Bellinger, or that Miss Peyton or Mrs. Bellinger were led to care for the children, and became attached to them on account of any conduct or misrepresentation of the petitioner from which they had a right to infer that they would be allowed to keep them permanently.

The next question is whether it is true, as charged, that petitioner's bad moral character and low financial condition make him unfit for the custody of his children. To establish this charge it is necessary to show clearly that provision for the ordinary comfort and contentment and the intellectual and moral development of the children is not to be expected at his hands. *Ex parte Davidge,* 72 S. C., 18. We do not think the evidence warrants such a conclusion. It is true, a number of residents of Barnwell of high character made affidavits to the effect that the petitioner was known to them as a thriftless man, unable to provide for the support of his family, and addicted to the excessive

use of liquor, and some of them say he pays no debts he can
avoid and has little if any regard for his moral obligations.
On the other hand, petitioner himself swears that in Barn-
well County he conducted a successful business, from which
he supported his children, and that he owes no debts there;
that he did not drink at all before the death of his wife, but
admits that after her death he did to some extent, and on
several occasions while living alone in the country in the
year 1903, he became intoxicated, but alleges he has not
been addicted to the use of liquor since moving to Green-
wood in December, 1903.

Many highly respectable citizens of Greenwood submit
affidavits that petitioner has led there an exemplary life, is
conducting a successful business, owns property of consider-
able value, and is generally regarded an estimable citizen.
It appears from the affidavits of the petitioner and his mother
and sisters that the children will be gladly received and cared
for by petitioner's mother and sisters, with whom he resides.
We cannot doubt that in the past the petitioner has brought
reproach upon himself and his children by his intemperate
habits, and that he has been in grave fault in allowing others
to provide in large degree for the support of his children,
but the evidence is plenary that a reformation has taken
place and that petitioner is now a fit person in character and
financial condition to have the custody and rearing of his
children.   It would be harsh to hold that for such faults as
these a parent should be forever deprived of his children,
notwithstanding his subsequent reformation.

In the meantime, however, the children, William Osborne
and Nannie, have become deeply attached to Miss Peyton,
and Mary Susan to Mrs. Bellinger, and earnestly
ask to be allowed to remain with them.   William
Osborne is now thirteen, Mary Susan is twelve, and
Nannie is nine years of age.

Under the English rule, it seems, that the wishes of a
child under the age of nurture, which is fourteen years, are
not to be consulted as to its custody against the claim of its

guardian by nurture, and this rule seems to receive recognition in *Ex parte Schumpert,* 6 Rich., 344, and *Ex parte Reed,* 19 S. C., 604, but it does not appear that the point was in either case necessarily involved or adjudicated. It was held, on the other hand, in *Ex parte Williams,* 11 Rich., 452, that the discretion of the Court was not to be controlled by the choice of a boy of fifteen years. The rule which we think has the support of common sense as well as authority, is thus stated in Hurd on Habeas Corpus, 532: "The welfare of the child, then, being the object to be attained, no consideration calculated to influence the decision of the question should be overlooked. Hence the wishes of the child are consulted, not because it has a legal right to demand it, but because it is material for the Court to understand them, that it may be the better prepared to exercise its discretion wisely. It is not the whim or caprice of the child which the Court respects, but its feelings, its attachments, its reasonable preference and its probable contentment. Consulting the wishes of the infant, we may conclude, is a mere rule of procedure founded upon the duty of the Court to exercise a wise circumspection, and not upon any legal right of the infant to decide for himself and the Court the question of custody."

In this case, Miss Peyton, who claims a gift of the children, is quite advanced in years, and in the course of nature would not probably live to rear the children to maturity. To decree that the children should remain with her would result in permanent separation from their father and the sister, who is now with him, and end the opportunity of the father to influence and discipline their lives, and regain their filial love and confidence. While the kindness and generosity of Miss Peyton and Mrs. Bellinger, which has elicited the loyal affection of the children, cannot be too highly commended, the evidence is that the children would have at their father's home comfort, educational advantages and affection. It would be unnatural if they did not object to leaving those from whom they have received so much kindness, but their preference is

only one factor to be considered by the Court in trying to decide for their best interests.

Upon careful consideration of all the facts, the Court is satisfied the children should be restored to their father, the petitioner, and it is so adjudged.

Since the rights and duties of the parties are established, there is increased incentive to amicable adjustment. There should be on the one side cheerful recognition of the rights of the parent, and on the other the exercise of those rights by the father with such tenderness and consideration as to ward off all needless pain, and to express his appreciation of the care and labor bestowed upon his offspring by Miss Peyton and Mrs. Bellinger.