### 11216

### BUSBEE v. REESE

(118 S. E., 185)

1. PARENT AND CHILD—FATHER RATHER THAN MATERNAL GRAND-MOTHER ENTITLED TO CUSTODY OF CHILD.—Where a child's mother died when he was three months old and his maternal grandmother had taken care of him until he was three years old, his father was of good character and financially able to take care of the child, had remarried and was living with his wife and other children, *held,* that the father was entitled to custody rather than the maternal grandmother.

#### On Motion to Amend Return

2. HABEAS CORPUS—DOCTRINE OF RES JUDICATA PREVENTS TRIAL 'OF ISSUES WHICH COULD HAVE BEEN TRIED ON ORIGINAL HEARING.—After a decision on appeal, allowing custody of an infant to petitioner, a motion to amend the return as originally filed and to have the issues raised by the amended return tried will be denied, as respondent is concluded under the principle of *res judicata* to try issues which, in the exercise of due diligence, could have been inquired into on the original hearing.

3. HABEAS CORPUS—JUDGMENT AWARDING CUSTODY DOES NOT PREVENT INQUIRY AS TO PETITIONER'S CHANGE OF CAPACITY SINCE JUDGMENT.—A judgment awarding custody of a child to his father will not prevent the change of custody on proof that, since the date of the judgment, conditions affecting the father's capacity to care for the child have been so changed as to render the father unfit to perform that service.

Before MOORE, J., Lexington, April, 1922. Reversed.

*Habeas corpus* by M. W. Busbee against Susie Reese.

From an order awarding custody of Howard Webster Busbee to respondent, petitioner appeals.

The order of Circuit Judge Moore referred to in the opinion of Mr. Justice Watts follows:

The above-entitled matter came before me by way of habeas corpus proceedings, begun by the petitioner in May, 1921, praying for the possession of his infant son, Horace Webster Busbee, then a child of about two years. The respondent is the maternal grandmother of the infant, and in her return claimed a gift of the child by its mother, her daughter, on her death bed, concurred in by the petitioner, and that the child was by the petitioner, in accordance with the gift, delivered to her, the petitioner had done practically nothing for the child and that she and her family had cared for it and raised it from a weak, sickly infant to a robust child, bearing all of the expenses and doing everything for it, and that now there has been formed a close and binding tie between them.

The testimony and affidavits are voluminous. After the filing of affidavits, both sides put witnesses on the stand, and testimony was taken in open Court April 7, 1922.

From the testimony it appears that there is little difference in the financial and social standing of the contesting parties. All appear to be respectable and law abiding, as well as able to support the child.

The question of the best interest of the child being the paramount issue was squarely before the Court.

There was a gift of the infant by the mother to the respondent. The latter claims that this gift was absolute. The petitioner admits the gift, but contends that it was to have effect only until such time as he could get situated so that he could take it back. This was followed by the petitioner carrying the child to the respondent on the day of the burial of his wife, sending over its clothes and the cradle, and thereafter leaving it absolutely in the possession of the grandmother, and neither he nor his family giving it

any great attention. The petitioner states that since the delivery of the child to respondent he and his family have given it some $30 or $40 worth of clothing and other things. Respondent contends that less than $1 has been given by the petitioner to the child which has been with them now some three years. From the certificate from the attending physican, it appears that the respondent has paid all the medical bills, etc., even when the petitioner was present at the treatment of the child.

Petitioner has two larger children with him. He has remarried, and his wife now has an infant only a few weeks old.

A close attachment has grown up between the respondent, her family, and the child. This is not the case with the family of the petitioner, for he admitted on the stand that more than a year had passed since he visited the child, though he was welcome at the Reese home, and that they were always glad for him to come and see the child and them.

Considering these facts, I am of the opinion that the gift made on the death bed of the mother of the child should be given great consideration, and that the showing of the petitioner is insufficient to warrant a change of custody, especially when petitioner has now a new infant which will require his and his wife's care and attention. The age of the infant, Horace Webster Busbee, is such that it will require constant care, nursing, and attention. This has been freely and successfully performed by the respondent. It requires prepared food and nourishment and constant attention. There could be no improvement by a change.

It is therefore ordered: That the custody of Horace Webster Busbee be, and the same is hereby, ordered awarded to the respondent, Mrs. Susie Reese. The petitioner, M. W. Busbee, is to have the right to visit the child as often as he likes and to give it any support and maintenance he cares to. The child shall still be subject to further and

other orders of this Court to meet changed conditions and
the growth and age of the child. Let the petitioner and
respondent each pay his or her own costs herein, except
that the petitioner shall pay for the transcript of the testi-
mony furnished to the presiding Judge and costs of the
Clerk of this Court.

*Messrs. Martin & Sturkie,* for appellant, cite: *Parent
being fit person is entitled to custody of child:* 20 R. C. L.,
599, 600; 73 S. C., 296; 72 S. C., 18; 29 Cyc., 1590; 165
Ind., 402; 6 Rich. Eq., 249; 99 S. C., 92; 114 S. C., 295;
14 R. C. L., 271, 272; 75 S. C., 220; 11 Rich. L., 452; 84
S. C., 476; 57 L. R. A., 839; 29 Cyc., 1595; 98 N. W., 631.

*Mr. J. H. Hammond* for respondent.

July 8, 1923.

The opinion of the Court was delivered by Mr. Justice
Marion.

As the question for determination is not only of
grave importance to the immediate parties in interest,
but involves the application of legal principles to
a phase of the domestic relations that I regard as of the
first importance to the good order of society and the welfare
of the State, I shall as briefly as possible state the grounds.

The Circuit Judge correctly finds:

"From the testimony it appears that there is little differ-
ence in the financial and social standing of the contesting
parties. All appear to be respectable and law abiding, as
well as able to support the child."

There is no evidence satisfactorily tending to establish
that the petitioner is an unfit and unsuitable person to be
intrusted with the custody and rearing of his own offspring,
and no such finding is made by the Circuit Judge. The evi-
dence on the contrary tends to establish, not only that the
petitioner is a good man and a good citizen, but that his
conduct with respect to the care and custody of this infant
is open to no valid criticism. The testimony tended to

establish that the petitioner had married Kittie Reese, the daughter of Mrs. Susie Reese, the respondent; that they had had three children, the youngest being the male infant here in question; that this child was about three months old when his mother died; that during the last illness of the mother and on her death bed she requested that her husband, the petitioner, allow her mother, Mrs. Reese, to keep the child until its father, Busbee, got in position to take care of it, and then to keep all three of the children together; that the petitioner had attained a position in life where he could take care of the infant, who at the time of his application was over 15 months old; that he had married a second wife who was able and willing to care for the child; that he was making a living for himself and family on a farm which was unincumbered; that he lived near a school and church, of which he was a patron and supporter; that he visited the baby about twice a week up until the time he found it necessary to commence this proceeding, when he discontinued his visits on account of the unpleasantness that had arisen as the result of his claiming the custody of the child; that he had offered to pay Mrs. Reese, the respondent, for any expense she had been put to and for her trouble in caring for the infant.

In the light of the foregoing evidence and of the Circuit Judge's failure to find that the father is in any way an unfit and unsuitable person to be intrusted with the bringing up of his own child, the petitioner's right as father to the custody of his son is a paramount claim against the world. As was said by Mr. Justice Woods in *Ex parte Davidge,* 72 S. C., 18; 51 S. E., 269:

"Even as against the mother herself, the father is held to have higher claim to the custody of the children, because upon him the law imposes the responsibility of their support and education, and, if in this duty he fails, he not only incurs the penalty of the law, but receives the brand of social disgrace. It is true, if it clearly appear that the

interests of the children will be promoted by taking them from either parent and intrusting them to the other, or from both parents and intrusting them to other members of the family, or even to strangers, the Court will exercise its discretion, having regard to the welfare of the children. But none will deny that ordinarily the most valuable possession of a child is the love and care of its parent, and its most sacred right is its right to live under the father's roof. While the welfare and happiness of the child is the main consideration, the parent's right to the love and influence of his children and the happiness they bring to him must be also recognized and considered along with the interests of the child. For a legal tribunal to separate a child from its parent is, therefore, a very strong measure, justified only by convincing proof of the parent's unfitness."

That the foregoing statement correctly announces the law of the land, recognized and applied in numerous decisions of this Court, there can be no doubt. *Ex parte Reynolds,* 73 S. C., 296; 53 S. E., 490; 114 Am. St. Rep., 86; 6 Ann. Cas., 936. *Hartley v. Blease,* 99 S. C., 92; 82 S. E., 991. *Ex parte Cannon,* 75 S. C., 220; 55 S. E., 325. *Ex parte Scurry,* 114 S. C., 295; 103 S. E., 534. As between the two parents, I am in entire accord with the modern tendency of the Court to relax the rule as to the paramount right of the father to the custody of the child. In a contest between the parents I incline to the view that their rights should be regarded as coequal and that the question of custody should turn solely upon the issue of fact as to the best interests of the child. But where the question is the right of the father to the custody of his child as against the claim of others, however closely related by ties of kinship, interest, or affection, then the only bar to the father's right which the Courts may properly recognize is that father's incapacity or unfitness, established by clear and convincing proof. In the old Courts of equity, exercising for the crown as *parens patriae* the prerogative

of aiding unfortunate minors through the great seal, the chancellor rarely acted save when property rights were involved. Nevertheless, the sound and wholesome doctrine that the father may forfeit his prior right to the custody of his children by his own misconduct was early recognized. Thus Lord Eldon took away the children of the Duke of Wellesley because of his profligate conduct (*Wellesley v. Wellesley*, 2 Russ. 1), and Shelley was deprived of the custody of his children because he declared himself an atheist (*Shelley v. Westbrooke*, Jac. 266). The principle applied in those cases and illustrated by those examples, in my judgment, still marks the judicial boundaries within which a Court may safely and wisely deprive a father of the custody and rearing of his own offspring.

This principle of the law that concedes to and vests in the father the paramount right to the custody and upbringing of his children is not only deeply rooted in nature, but is in accord with the canons of revealed religion, and is soundly grounded in those tenets of Christian statesmanship upon which our whole governmental structure rests. It is the necessary corollary of the truth, evolved from the experience of the race in its development through the patriarchal and national stages, that the family is the corner stone of civilization; that it is not simply a device for the maintenance of the species, but is "a school of education as well as an empire of law" in which "the great principles are unfolded upon which all human government rests and society is created in germ"; that the citizen needs to be "moulded as well as controlled," and that "the superlative value" of the family to the State "is found in the combination of influence with authority under which men are trained to the obedience which requires to be enforced." Though the family in our modern society may fail to measure up to that conception of it, so ably expounded by an eminent South Carolina divine of a past generation (Dr. Benj. Morgan Palmer), I am not prepared to concede that

such failure may properly be regarded as the hall-mark of progress toward higher and better things. Making all due allowance for the difference between the rearing of a family under modern conditions and in the times of the patriarchs, or even of our immediate forefathers, I cannot subscribe to the doctrine of the modern socialist, communist, or bolshevist that the family as an institution has served its day of usefulness in the evolution of the race, that the old-fashioned home is an anachronism, that parental authority should be delegated to, and parental responsibility assumed by, the State, and that this power should be administered through agencies of State constituted for that purpose. And yet that doctrine—false in principle and pernicious in tendency—is squarely predicated upon the theory of the "child's best interests"—that it is better for the child and for society that his upbringing and training should be committed to experts than that this important task should be left to the uncertain chance of proper discharge by more or less inefficient parents. To argue seriously against the soundness of that doctrine would be an affront to the intelligence of my conferees. Nevertheless, the reasons that impeach its validity are the selfsame reasons that apply squarely to the disposition of this cause.

Here we have a home and a family—just such a home and family, apparently, as have in the past nurtured, disciplined, and trained the type of citizenship that founded and that has preserved this republic—headed by a sturdy American farmer who has successfully begun the fulfillment of that laudable ambition, within which is embraced both his own and the State's highest good, to make a home and to rear his children under his own vine and fig tree. He has as helpmate a second wife, as to whose character and capacity the evidence suggests no question. He has in that home this infant's elder brother and sister of the whole blood and a younger brother or sister of the half blood.

To deny petitioner's prayer to have this child restored to the father's home, that he may be reared as a member of a reunited family circle, is not only in derogation of the father's legal right to the custody of his own child but, in my judgment, is clearly to sanction what is not for the best interests of the child himself. That it is better for this boy that he should, be separated from his father and his brothers and sisters and raised to himself in his grandmother's home, in an atmosphere of indulgent tenderness, is a conclusion that flies in the face of common experience. To deprive the boy of the opportunity to take a child's place in the father's house, where he could grow up in close daily contact and association with brothers and sisters, subject to parental control and disciplined by the "give and take" of the family democracy, is to deprive him of his own best birthright and of his best chance to grow into a good man and useful citizen.

· The boy is now more than three years old. For obvious reasons, if he is to be restored to his father's custody at all, that step should not longer be delayed.

The circuit decree is reversed, and the custody of the child awarded to the petitioner.

MESSRS. JUSTICES FRASER and COTHRAN concur.

MR. JUSTICE WATTS (dissenting). This is an appeal from an order of Judge Moore awarding the custody of Howard Webster Busbee to Mrs. Susie Reese. The order of Judge Moore will be reported.

The appellant by exceptions, five in number, seeks reversal of Judge Moore's order, and asks that the custody of the infant be awarded to the appellant, the infant's father.

This Court always looks in such cases to the welfare of the infant, and in this case we can see no reason why we should reverse Judge Moore's order, and substitute our judgment for his.

The exceptions should be overruled, and the order appealed from affirmed.

MR. CHIEF JUSTICE GARY concurs.

## ON MOTION TO AMEND RETURN

The motion of the respondent praying that she be allowed to amend her return to the petition in habeas corpus as originally filed in the Circuit Court, and that the issues raised by such amended return be heard by this Court in its original jurisdiction, or, in the alternative, for an order suspending the appeal to permit the respondent movant to apply to the Circuit Court for the relief sought, has been accorded careful consideration. To the extent the question of the father's unfitness could have been inquired into and established by the respondent, in the exercise of due diligence, at the time the hearing in the Court below, the respondent is concluded under the principle of *res judicata*. She has had her day in Court. If, since the date of the hearing in the Circuit Court, the father's character has deteriorated, or conditions affecting the father's fitness or capacity to undertake the care and rearing of his child have changed, to an extent that would render him an unsafe, unfit, and improper person to be intrusted with the custody and care of his child, it is to be observed that the judgment herein rendered does not prevent this Court or any other Court of competent jurisdiction in this State from changing the custody of the child upon proof of such material change of conditions as to make such a step proper. *Ex parte Tillman,* 84 S. C., 567; 66 S. E., 1049; 26 L. R. A. (N. S.), 781.

The relief sought involves a departure from the usual and orderly procedure of this Court in the disposition of a cause, heard and finally determined, for which, in the Court's opinion, no sufficient ground has been shown to exist in the case at bar.

It is accordingly ordered that the motion be, and is hereby refused, and that the stay of remittitur heretofore granted be revoked.